**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RAPHAEL CHRISTOPHER,** | : | **CIVIL ACTION NO. 1:04-CV-0977** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **FREDERICK NESTLERODE, et al.,** | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

"Racial profiling" has become a familiar phrase in the last decade.  Debate has swirled over the existence and persistence of the practice, in which law enforcement officials target individuals for investigation or detention based on race.[1]  The issue also pervades this case.  Raphael Christopher asserts that members of a county sheriff's department stopped his vehicle and issued him a traffic citation because he was an African-American driving an expensive car in the wrong neighborhood.  The officers, as might be expected, dispute these charges.

---

[1] See generally R. Richard Banks, Racial Profiling and Antiterrorism Efforts, 89 CORNELL L. REV. 1201 (2004); Phyllis W. Beck & Patricia A. Daly, State Constitutional Analysis of Pretext Stops:  Racial Profiling and Public Policy Concerns, 72 TEMP. L. REV. 597 (1999); William M. Carter, Jr., A Thirteenth Amendment Framework for Combating Racial Profiling, 39 HARV. C.R.-C.L. L. REV. 17 (2004); Brandon Garrett, Remedying Racial Profiling, 33 COLUM. HUM. RTS. L. REV. 41 (2001); Samuel R. Gross & Debra Livingston, Racial Profiling Under Attack, 102 COLUM. L. REV. 1413 (2002); David A. Harris, The Stories, the Statistics, and the Law:  Why "Driving While Black" Matters, 84 MINN. L. REV. 265 (1999); David Rudovsky, Law Enforcement by Stereotypes and Serendipity:  Racial Profiling and Stops and Searches Without Cause, 3 U. PA. J. CONST. L. 296 (2001).

Presently before the court are cross-motions for summary judgment. Plaintiff argues that the officers acted outside of their jurisdictional authority under state law, rendering their conduct presumptively unconstitutional. Defendants counter that their actions represented a good-faith fulfillment of law enforcement duties, entitling them to immunity from liability. After reviewing the summary judgment record in light of governing federal law, the court finds that it cannot agree with either position.

## I.   **Statement of Facts**

The stop occurred in the late morning of August 5, 2003. Christopher was driving his car, a 2000 Lexus, on a four-lane street in the City of York, Pennsylvania. The posted speed limit was twenty-five miles per hour, and the roadway was somewhat wet due to recent rains. Christopher passed a marked sheriff's vehicle operated by Frederick Nestlerode, a member of the York County Sheriff's Department. Nestlerode activated his warning lights, and effected a stop of Christopher's automobile. Christopher was cited for driving at an unreasonable speed under the conditions and for failing to notify the state transportation department of a recent change of address.[2] The charges were later dismissed by

---

[2] See 75 PA. CONS. STAT. §§ 1515, 3361. According to the state supreme court, the authority of Pennsylvania sheriffs to issue citations for traffic violations derives from common law and, indeed, the myths of English folklore. See Commonwealth v. Leet, 641 A.2d 299, 302-03 (Pa. 1994) ("[F]ew children would question that the infamous Sheriff of Nottingham had at least the authority to arrest Robin Hood.") (citing neither JAMES CLARKE HOLT, ROBIN HOOD (1983), nor HOWARD PYLE, THE MERRY ADVENTURES OF ROBIN HOOD (Dover Publ'ns 1968) (1883)); see also Commonwealth v. Lockridge, 810 A.2d 1191, 1194-95 (Pa. 2002).

Pennsylvania courts, which found that Nestlerode lacked probable cause to effect the stop.[3]  (Doc. 29 ¶¶ 6, 9, 34-49; Doc. 29, Ex. A at 57, 104, 122-23; Doc. 53 ¶¶ 6, 9, 34-49; Doc. 53, Ex. D at 34-36, 52-59, 70-76; Doc. 64, Ex. 1).

The details of the stop, which lasted for about ten minutes, are matters of significant debate.  Christopher alleges that Nestlerode identified him as African-American before deciding to stop the car; Nestlerode maintains that he was not aware of Christopher's race until after he approached the latter's driver-side window.  Christopher asserts that he was traveling at twenty-five to thirty miles per hour; Nestlerode estimates that Christopher was traveling at fifty to fifty-five miles per hour.  Christopher contends that no pedestrians were in the area; Nestlerode argues that parked vehicles and people "in the general area" were threatened by Christopher's driving.  Christopher states that Nestlerode was verbally abusive and refused to disclose the nature of the offense; Nestlerode recalls that he courteously requested Christopher's license and registration and informed him of the grounds for the stop.  The competing versions of the event are each supported by evidence of record.  (See, e.g., Doc. 57 ¶¶ 8-11; Doc. 79, Ex. B at 81-91; Doc. 79, Ex. F)

There is further dispute over other officials' participation in, or failure to prevent, the allegedly improper stop.  Matthew Kerr, a deputy sheriff training under Nestlerode at the time of the stop, was sitting in the passenger seat of the

---

[3] It is not entirely clear whether the state courts dismissed the charges on federal or state grounds.  (See Doc. 64, Ex. 1).

sheriff's vehicle when Christopher's car passed by them.  He agreed with Nestlerode that Christopher was driving too fast, and aided Nestlerode by notifying the sheriff's department of the stop and monitoring the car while Nestlerode spoke with Christopher.  Kerr later testified in support of the charges against Christopher.  The parties disagree whether these actions render Kerr responsible for the stop.  (Doc. 29 ¶¶ 10-11; Doc. 29, Ex. A at 124; Doc. 53 ¶¶ 10-11).

Both Nestlerode and Kerr were, at the time of the stop, under the supervision of William Hose, Sheriff of York County.  Hose possessed final authority in the County of York for the supervision and training of the deputy sheriffs, all of whom were required to complete courses on cultural awareness and constitutional criminal procedure.[4]  He had previously suspended Nestlerode for violations of department policy related to the prolonged detention of "two black and two Hispanic inmates."  Nestlerode had also been issued misconducts (by officials other than Hose) for incidents involving breach of standard protocols and abuse of position.  Nevertheless, Hose did not require Nestlerode to complete additional training on proper procedure.  To the contrary, he assigned Nestlerode the responsibility for instructing other deputies, like Kerr, to effect traffic stops.

---

[4] Pennsylvania law mandates that deputy sheriffs undergo basic training in a range of topics, including criminal procedure and cultural diversity.  37 PA. CODE. §§ 421.3, 421.11-.12; see also PA. STAT. ANN. tit. 71, §§ 2104-2107.  They must also complete minimum education requirements relating to vehicle and traffic regulations to be authorized to enforce provisions of the Pennsylvania Motor Vehicle Code.  See Commonwealth v. Kline, 741 A.2d 1281, 1285 (Pa. 1999); see also supra note 2.  Neither party disputes that Nestlerode and Kerr satisfied these training obligations.

Christopher argues that the failure to provide adequate training to Nestlerode and Kerr was a proximate cause of the stop on August 5, 2003.  (Doc. 29 ¶¶ 20-24, 33, 84-104; Doc. 29, Ex. A at 11-18, 31-34, 96-98; Doc. 29, Exs. G, H; Doc. 52 at 21, 26-29, 36-37, 47, 54, 130-40, 186-94; Doc. 53 ¶¶ 20-24, 33, 84-104; Doc. 53, Ex. C at 92; Doc. 53, Ex. D at 34-36, 97, 111-13; Doc. 58 at 15; Doc. 63, Ex. A).

Christopher commenced the case *sub judice* in May 2004, seeking relief under 42 U.S.C. § 1983 for deprivations of his constitutional rights.  He alleges that Nestlerode and Kerr are liable for effecting the stop without probable cause in violation of the Fourth Amendment and for racial discrimination in violation of the Fourteenth Amendment.  He asserts that Hose and the County of York are liable for failing to provide adequate training on issues of racial profiling.  A series of cross-motions for summary judgment were filed in December 2004 and, with leave of court, in April 2005.[5]  Jury selection is scheduled to commence in July 2005.  (Docs. 1, 26, 32, 44, 50, 67, 69, 72).

## II.    <u>**Standard of Review**</u>

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue of material fact," and for which a jury trial would be an empty and unnecessary formality.  It places the burden on the non-moving party to come forth with "affirmative evidence, beyond the allegations of the

---

[5] Supplemental briefing was requested and received on several issues, including the effect of state law on Fourth Amendment analysis and the nature of a sheriff's policymaking authority under Pennsylvania law.  (Docs. 86, 91, 92).  The court appreciates counsels' expedited responses to this request.

pleadings," in support of its right to relief.  Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 314 (M.D. Pa. 2004); see also FED. R. CIV. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see also FED. R. CIV. P. 56(c), (e).  Only if this threshold is met may the cause of action proceed.  Pappas, 331 F. Supp. 2d at 314.

**III.**   **Discussion**

The Civil Rights Act of 1871, codified at 42 U.S.C. § 1983, is the quintessential remedial statute.  It does not confer rights, or expand those provided elsewhere under federal law.  Rather, it simply provides a procedural vehicle by which individuals subjected to a deprivation of rights arising under the "Constitution and laws" of the United States may secure redress.  Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).  A person acting "under color of [state law]" who directly participates in, or casually facilitates, a violation of an individual's federally secured rights may be held liable for that violation under § 1983.  See, e.g., Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 60 (1999).[6]

---

[6] It is undisputed in this case that defendants acted under color of state law for purposes of § 1983.

The claims *sub judice* implicate distinct issues of substance and causation. Defendants initially claim that plaintiff has failed to demonstrate a substantive violation of his federal rights.  They alternatively argue that, assuming a violation occurred, it is not causally attributable to them.  The court will address these contentions in turn.

### A.   <u>Violation of Federally Secured Rights</u>

Whether an individual may maintain an action under § 1983 depends, in the first instance, on whether he or she has suffered a cognizable violation of a right secured under the United States Constitution or the United States Code.[7]  <u>See Kneipp</u>, 95 F.3d at 1204; <u>Elkin v. Fauver</u>, 969 F.2d 48, 52 (3d Cir. 1992).  It is thus crucial to define the source and scope of the right asserted.  <u>Graham v. Connor</u>, 490 U.S. 386, 394 (1989).  The inquiry is one of federal law, based exclusively on the provisions of the United States Constitution, the enactments of Congress, and the interpretations of the federal judiciary.  <u>See Gonzaga</u>, 536 U.S. at 282-85.  Only if these sources demonstrate a clear legislative intent to confer an enforceable right

---

[7] Or, under appropriate circumstances, the regulations implementing congressional commands.  <u>See</u> <u>Alexander v. Sandoval</u>, 532 U.S. 275, 284-89 (2000); <u>Three Rivers Ctr. for Indep. Living v. Hous. Auth.</u>, 382 F.3d 412, 424-31 (3d Cir. 2004); <u>S. Camden Citizens in Action v. N.J. Dep't of Envtl. Prot.</u>, 274 F.3d 771, 788-89 (3d Cir. 2001).  <u>See generally</u> Brian D. Galle, <u>Can Federal Agencies Authorize Private Suits Under Section 1983?  A Theoretical Approach</u>, 69 BROOK. L. REV. 163 (2003); Matthew C. Stephenson, <u>Public Regulation of Private Enforcement:  The Case for Expanding the Role of Administrative Agencies</u>, 91 VA. L. REV. 93 (2005).

on the plaintiff may a cause of action under § 1983 be maintained.  See id.; Sabree ex rel. Sabree v. Richman, 367 F.3d 180, 183-90 (3d Cir. 2004).[8]

There is no question that the individual liberties embodied by the Fourth and Fourteenth Amendments, to freedom from unreasonable seizures and to equal protection of the laws, confer rights on Christopher that may be enforced through § 1983.[9]  The precise contours of these rights, however, are less clear.  Each will be examined to determine whether the conduct of which Christopher complains impinges on the rights accorded by these provisions.

### 1.   Fourth Amendment

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  It protects against arbitrary deprivations of liberty and invasions of privacy, and requires that any official restraint be justified by valid government interests.  United States v. Knights, 534 U.S. 112, 118-19 (2001).  Only when a search or seizure is objectively "reasonable" under this measure is it

---

[8] See generally Bradford C. Mank, Suing Under § 1983:  The Future After Gonzaga University v. Doe, 39 Hous. L. Rev. 1417 (2003).

[9] See, e.g., Gibson v. Superintendent of N.J. Dep't of Law & Pub. Safety-Div. of State Police, No. 04-1847, 2005 WL 1393752, at *3 (3d Cir. June 14, 2005).

permissible under constitutional standards.[10]  E.g., United States v. Banks, 540 U.S. 31, 36-37 (2003).

Neither party disputes that the brief stop of Christopher's vehicle constitutes a "seizure" of a "person" within the ambit of the Fourth Amendment.  See, e.g., United States v. Arvizu, 534 U.S. 266, 272 (2002).  But the parties differ substantially on the proper standard to be employed in assessing the "reasonableness" of that action.  Specifically, they disagree over whether the unlawfulness of an arrest under state law establishes the unreasonableness of the seizure under federal law.

---

[10] For cogent, competing views on the historical basis for the "reasonableness" standard, compare Thomas Y. Davies, Recovering the Original Fourth Amendment, 98 MICH. L. REV. 547 (1999), with Akhil Reed Amar, Fourth Amendment First Principles, 107 HARV. L. REV. 757 (1994).

Resolution of this issue, which has drawn significant commentary,[11] requires a

thorough explication of Fourth Amendment jurisprudence.

It is clear, as a threshold matter, that the interpretation of the Fourth

Amendment cannot be dependent upon the law of a single state.  The Constitution

and the Bill of Rights are federal documents, equally applicable across state

boundaries.  They represent the judgment of the "People of the *United States*" that

certain rights are so precious that they may not be infringed by government under

any guise of authority.  U.S. CONST. pmbl. (emphasis added).  These liberties

neither flow from nor are bound to the legislative enactments of a single state or

---

[11] See 1 WAYNE R. LAFAVE, SEARCH AND SEIZURE:  A TREATISE ON THE FOURTH AMENDMENT § 1.5 (4th ed. 2004); George E. Dix, Fourth Amendment Federalism:  The Potential Requirement of State Law Authorization for Law Enforcement Activity, 14 AM. J. CRIM. L. 1 (1987); Kenneth J. Melilli, Exclusion of Evidence in Federal Prosecutions on the Basis of State Law, 22 GA. L. REV. 667 (1988); Nicholas L. Lopuszynski, Comment, Father Constitution, Tell the Police To Stay on Their Own Side:  Can Extra-Jurisdictional Arrests Made in Direct Violation of State Law Ever Cross the Fourth Amendment's "Reasonableness" Line?, 53 DEPAUL L. REV. 1347 (2004); see also Pasiewicz v. Lake County Forest Pres. Dist., 270 F.3d 520, 527 (7th Cir. 2001); United States v. Jones, 185 F.3d 459, 462-63 (5th Cir. 1999); United States v. Bell, 54 F.3d 502, 503-04 (8th Cir. 1995); United States v. Mota, 982 F.2d 1384, 1386-89 (9th Cir. 1993); United States v. Miller, 452 F.2d 731, 733-34 (10th Cir. 1971); United States v. Peach, 327 F. Supp. 2d 1081, 1085-86 (D.N.D. 2004); United States v. Coleman, 162 F. Supp. 2d 582, 586-87, 591-93 (N.D. Tex. 2001), aff'd, 84 Fed. Appx. 428 (5th Cir. 2003), cert. denied, 541 U.S. 1036 (2004); Horn v. City of Seat Pleasant, 57 F. Supp. 2d 219, 22-25 (D. Md. 1999); People v. McKay, 41 P.3d 59, 69 (Cal. 2002); Thomas K. Clancy, What Constitutes an "Arrest" Within the Meaning of the Fourth Amendment?, 48 VILL. L. REV. 129 (2003); James W. Diehm, New Federalism and Constitutional Criminal Procedure:  Are We Repeating the Mistakes of the Past?, 55 MD. L. REV. 223 (1996); cf. United States v. Wilson, 169 F.3d 418, 423-24 (7th Cir. 1999) (addressing warrant requirement); United States v. Stiver, 9 F.3d 298, 300 (3d Cir. 1993) (same); United States v. Rickus, 737 F.2d 360, 363-64 (3d Cir. 1984) (addressing vehicle search).

the flowing tides of opinion.  They are indelible in nature and national in

character.  To tie their meaning to the judgment of a discrete segment of the

population would be a disservice to all others.  See THE FEDERALIST NOS. 39-46

(James Madison).[12]

It would also be a disservice to the states, as sovereign entities separate from

the national government.  States are entitled to formulate rules governing the

powers and conduct of their officials and to determine how and when those rules

should be enforced.  See id. NOS. 39, 46.[13]  These matters are wholly within the

province of the state and are properly immune from federal consideration.  See

Michigan v. Long, 463 U.S. 1032, 1038-44 (1983).[14]  Indeed, as the Supreme Court has

noted, "it is difficult to think of a greater intrusion on state sovereignty than when

---

[12] See also Hawke v. Smith, 253 U.S. 221, 226 (1920); McCulloch v. Maryland,
17 U.S. (4 Wheat.) 316, 404-05, 428-29 (1819); THE FEDERALIST NO. 15 (Alexander
Hamilton).  See generally JACK N. RAKOVE, ORIGINAL MEANINGS:  POLITICS AND
IDEAS IN THE MAKING OF THE CONSTITUTION (1997); GORDON S. WOOD, THE CREATION
OF THE AMERICAN REPUBLIC, 1776-1787 (1969); J. Harvie Wilkinson III, Our
Structural Constitution, 104 COLUM. L. REV. 1687 (2004); Akhil Reed Amar, The Bill
of Rights as a Constitution, 100 YALE L.J. 1131 (1991).

[13] See generally Henry Paul Monaghan, We the People[s], Original
Understanding, and Constitutional Amendment, 96 COLUM. L. REV. 121 (1996).

[14] See also U.S. CONST. amend. X; Gerstein v. Pugh, 420 U.S. 103, 123-24
(1975); Younger v. Harris, 401 U.S. 37, 44 (1971); Sibron v. New York, 392 U.S. 40,
60-62 & n.20 (1968); Ker v. California, 374 U.S. 23, 30-35 (1963) (plurality opinion).
See generally William J. Brennan, Jr., The Bill of Rights and the States:  The
Revival of State Constitutions as Guardians of Individual Rights, 61 N.Y.U. L. REV.
535 (1986); William J. Brennan, Jr., State Constitutions and the Protection of
Individual Rights, 90 HARV. L. REV. 489 (1977); Shirley S. Abrahamson, Criminal
Law and State Constitutions:  The Emergence of State Constitutional Law, 63 TEX.
L. REV. 1141 (1985).

a federal court instructs state officials on how to conform their conduct to state law." Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 106 (1984).

Neither the Fourth Amendment nor the Constitution as a whole depends upon the law of a single state for substantive meaning.  They establish an overarching, minimum code of conduct with which all officials, state and federal, must comply.  See California v. Greenwood, 486 U.S. 35, 43 (1988); Elkins v. United States, 364 U.S. 206, 215 (1960); Wolf v. Colorado, 338 U.S. 25, 27-28 (1949).[15]  So long as officials conform to that code, their activities—even if illegal under state law—do not implicate constitutional concerns.  See Cooper v. California, 386 U.S. 58, 60-62 (1967).[16]

This is not to say that state law is utterly divorced from constitutional analysis.  The Fourth Amendment standard for a search or seizure is "reasonableness," judged by an objective weighing of "the intrusion on the individual's [privacy] interests" and "its promotion of legitimate governmental

---

[15] For an interesting critique of the incorporation doctrine, under which the Bill of Rights has been held to apply to states through the Fourteenth Amendment, see George C. Thomas III, When Constitutional Worlds Collide:  Resurrecting the Framers' Bill of Rights and Criminal Procedure, 100 MICH. L. REV. 145 (2001) (citing, among others, MICHAEL KENT CURTIS, NO STATE SHALL ABRIDGE (1986), and RAOUL BERGER, GOVERNMENT BY JUDICIARY:  THE TRANSFORMATION OF THE FOURTEENTH AMENDMENT (2d ed. 1997)).  An equally intriguing discussion of incorporation, and the necessity of "tailoring" constitutional standards to application in different levels of government, is presented in Mark D. Rosen, The Surprisingly Strong Case for Tailoring Constitutional Principles, 153 U. PA. L. REV. 1513 (2005).

[16] See also Snowden v. Hughes, 321 U.S. 1, 11 (1944) ("[S]tate action, even though illegal under state law, can be no more and no less constitutional . . . than if it were sanctioned by the state legislature.").

interests." <u>Delaware v. Prouse</u>, 440 U.S. 648, 654 (1979); <u>see also</u> <u>Knights</u>, 534 U.S. at 119.  The nature of these interests, and the weight they should be accorded, is gauged in part by reference to the policies of the several states, as reflected in their past and current legislative enactments.[17]  <u>Atwater v. City of Lago Vista</u>, 532 U.S. 318, 340-45 (2001); <u>Payton v. New York</u>, 445 U.S. 573, 598-600 (1980).  State law plays an important role in Fourth Amendment analysis as part of the jurisprudential background informing past and contemporary notions of "reasonableness."

But the "state law" to be considered is not, as plaintiff contends, the law of a single state.  Limiting the analysis to the policies of an individual jurisdiction would conflict with the principles of constitutional federalism previously described.  Rather, "state law," for these purposes, encompasses the laws of *all* states.  <u>See, e.g., id.</u>  It is intended to reflect the *national* judgment of the scope of the privacy rights embodied in the Fourth Amendment.  <u>Atwater</u>, 532 U.S. at 340 (citing <u>Wilson v. Arkansas</u>, 514 U.S. 927, 933 (1995)).

"Reasonableness" is obviously an amorphous concept, with few concrete guideposts to direct the actions of the "officer on the street."  To address this problem, the Supreme Court has distilled from the general standard a series of specific rules describing conduct that is presumptively "reasonable" in particular scenarios.  <u>See, e.g.</u>, <u>Thornton v. United States</u>, 124 S. Ct. 2127, 2130-31 (2004);

---

[17] Of perhaps greater importance in the weighing process are the views of the Framers, as demonstrated by the common law and their own writings.  <u>See</u> <u>Wyoming v. Houghton</u>, 526 U.S. 295, 300 (1999); <u>see also</u> <u>Atwater v. City of Lago Vista</u>, 532 U.S. 318, 327 (2001).

<u>Atwater</u>, 532 U.S. at 347.  These represent the outcome of the weighing of individual and government interests involved in certain archetypal situations.  <u>See</u> <u>id.</u>  They are equally applicable to all officials, whether state or federal, and across all state borders.  <u>See</u> <u>Maryland v. Pringle</u>, 540 U.S. 366, 369-70 (2003) (citing <u>Mapp v. Ohio</u>, 367 U.S. 643 (1961)); <u>Elkins</u>, 364 U.S. at 215.

An exhaustive description of these rules is unnecessary and likely impossible due to the nearly infinite variety of police-citizen encounters.[18]  <u>See, e.g.</u>, <u>Ohio v. Robinette</u>, 519 U.S. 33, 39 (1996).  Nevertheless, some of the more common bear note as relevant to the discussion in this case:  A person may be seized without a warrant if officers have "individualized" and "articulable" grounds to suspect the person of a criminal offense.  <u>Whren v. United States</u>, 517 U.S. 806, 817-18 (1996).  Police may enter a home without a warrant when "exigent circumstances" support the action.  <u>Welsh v. Wisconsin</u>, 466 U.S. 740, 752-53 (1984).  Officials may conduct a search of a person and surrounding areas "incident to a lawful arrest."[19]  <u>United</u>

---

[18] These "rules" have previously, and alternatively, been described as "exceptions" to the warrant requirement.  <u>See</u> <u>California v. Acevedo</u>, 500 U.S. 565, 582 (1991) (Scalia, J., concurring in judgment); Amar, <u>supra</u> note 10, at 763-63; Craig M. Bradley, <u>Two Models of the Fourth Amendment</u>, 83 MICH. L. REV. 1468, 1473-74 (1985).

[19] A search incident to an arrest, which is broad in scope and potentially includes areas outside of the suspect's reach, <u>see, e.g.</u>, <u>Thornton</u>, 124 S. Ct. at 2130-31, should not be confused with a search incident to a seizure, which is generally limited to a brief pat-down of the suspect for the purpose of identifying weapons, <u>see, e.g.</u>, <u>Minnesota v. Dickerson</u>, 508 U.S. 366, 373 (1993) (citing <u>Terry v. Ohio</u>, 392 U.S. 1 (1968)).  The former depends on the occurrence of an "arrest" under state law, while the latter depends on the occurrence of a "seizure" under federal law.  <u>See</u> <u>id.</u>; <u>see also</u> <u>infra</u> notes 24, 25.

States v. Robinson, 414 U.S. 218, 234-35 (1973).  All of these rules flow from the constitutional standard of "reasonableness."

Individual state law becomes relevant only in the *application* of these rules. For example, the existence of "individualized suspicion" that a person has committed a crime depends on the elements of the crime under state law.  See, e.g., Johnson v. Campbell, 332 F.3d 199, 205-14 (3d Cir. 2003).  The presence of "exigent circumstances" to support warrantless or unannounced entry into a home rests in part on the "gravity of the underlying offense" as defined by state law.  See, e.g., Welsh, 466 U.S. at 752-53.  And whether a search may be conducted incident to an arrest hinges on whether the arrest was lawful under state law.[20]  See, e.g., United States v. Myers, 308 F.3d 251, 255 (3d Cir. 2002).  Consideration of state law in these circumstances does not alter the federal character of the reasonableness standard, but merely reflects the application of rules discerned from the federal standard in concrete factual scenarios.[21]

It is thus important, in determining the role of state law in Fourth Amendment analysis, to distinguish among the governing "standard," the appropriate "rule," and the "application" of that rule.  The overarching *standard* of reasonableness is embodied within the Fourth Amendment.  E.g., Banks, 540 U.S.

---

[20] See infra note 25 and accompanying text (discussing consideration of state law in context of search incident to arrest).

[21] Cf. Pappas, 331 F. Supp. 2d at 316 & n.9 ("Whether a benefit is recognized as 'property' under the Constitution is a matter of federal law, but the substantive interests informing the federal standard are created by state law.").

at 36-37.  The *rules* applicable in particular police encounters are discerned from the broad reasonableness standard after consideration of the views of the Framers and the collective policies of the states.  E.g., Payton, 445 U.S. at 598-600.  The *application* of those rules is based on the totality of the facts underlying a particular case and, at least in part, on the law of the jurisdiction in which the incident occurred.[22]  E.g., Atwater, 532 U.S. at 354.  The relevance of state law in a given case depends on the nature of the analysis to be conducted.

The case *sub judice* involves a public seizure of a person based on probable cause.  The applicable rule in this situation, flowing directly from the constitutional standard of "reasonableness," requires that officers have "individualized suspicion," based on plausible and articulable grounds, that the person committed (or is committing) an offense under state law.  Whren, 517 U.S. at 817-18 (quoting Prouse, 440 U.S. at 654-55).  The constitutional prerequisite of individualized suspicion constrains police discretion, adequately protecting against arbitrary deprivations of privacy and liberty without the need for further

---

[22] This sharp dichotomy between the "standard" of reasonableness and the "rules" applicable in certain factual scenarios is open to criticism as overly formalistic.  See, e.g., Banks, 540 U.S. at 36-37; Robinette, 519 U.S. at 39.  Nevertheless, it is well supported by decisions of the Supreme Court.  See, e.g., Thornton, 124 S. Ct. at 2130-31; Atwater, 532 U.S. at 354; cf. Amar, supra note 10, at 800-11 (arguing for generalized reasonableness standard but suggesting rules applicable in certain scenarios).  Moreover, this analytic distinction should not be interpreted as abrogating the court's obligation to conduct a *de novo* review of all *facts* surrounding a seizure to determine whether probable cause or reasonable suspicion exists and whether the search satisfies the overall constitutional standard of reasonableness.  See, e.g., Banks, 540 U.S. at 36-37; Arvizu, 534 U.S. at 272; Knights, 534 U.S. at 119; Robinette, 519 U.S. at 39; see also infra note 29.

inquiry into state interests justifying the particular seizure.  Id.; see also Atwater, 532 U.S. at 354.  Thus, it does not matter for these purposes whether the official was empowered under state law to detain the suspect for the offense or complied with standard arrest procedures.  See id. at 346-47, 354.  The sole issue is whether, based on the facts and circumstances then known to the official, an objective observer could plausibly conclude that the person was in violation of state law.  Id. (citing Dunaway v. New York, 442 U.S. 200, 208 (1979)).

Plaintiff cites several decisions from the Supreme Court and Third Circuit in support of the contrary position, that "where a state official has no authority to make a seizure for a particular offense[] the seizure is unreasonable under the Fourth Amendment."  (Doc. 92 at 3).  But these opinions all address the constitutionality of a search incident to arrest, not a seizure based on individualized suspicion of a crime.  See United States v. Johnson, 333 U.S. 10, 15 & n.5 (1948); United States v. Di Re, 332 U.S. 581, 589-91 (1948); United States v. Day, 455 F.2d 454, 455-56 (3d Cir. 1972) (per curiam).[23]  These searches are allowed as a matter of standard police procedure, regardless of the presence of individualized suspicion of contraband or weapons, and are designed to protect officers by allowing them to search a suspect when he or she is formally taken into custody

---

[23] See also Michigan v. DeFillippo, 443 U.S. 31, 36 (1979); United States v. Mota, 982 F.2d 1384, 1386-89 (9th Cir. 1993); cf. Pringle, 540 U.S. at 369-70 (considering state arrest law to the extent that it is "is consistent with the Fourth Amendment); United States v. Watson, 423 U.S. 411, 416-17 (1976) (same) (citing Di Re, 332 U.S. at 585); Ker, 374 U.S. at 37 (same); Henry v. United States, 361 U.S. 98, 100 (1959) (same).

through an "arrest."  See Thornton, 124 S. Ct. at 2130-31 (citing United States v. Robinson, 414 U.S. at 235; Chimel v. California, 395 U.S. 752, 763 (1969)).  When an "arrest" occurs—and when an officer may properly invoke this authority—is *not* governed by the Constitution, which notably does not define or use the term.[24] Instead, it is governed by state law, which delineates the methods by which an officer may take a person into formal custody (thus exposing the officer to the danger that a search incident to arrest is designed to ameliorate).  See Robinson, 414 U.S. at 235.  State law, in this circumstance, provides a limit on police discretion that would otherwise be lacking.  This constraint is provided in the public seizure context by the requirement of "individualized suspicion," see

---

[24] While court decisions often use the terms "stop" and "arrest" when discussing Fourth Amendment principles, these should not be understood as different types of seizures, but as shorthand references for the permissible purpose of the seizure and the "quantum of individualized suspicion" necessary to justify it. California v. Hodari D., 499 U.S. 621, 627 n.3 (1991).  A "seizure" occurs whenever police detain a person through show of authority—regardless of the manner, purpose, or length of the detention—whereas an "arrest" is normally defined under common law and state law as physically taking a person into custody.  See id. at 624-29; Sibron, 392 U.S. at 60-62 & n.20.  A seizure, once it occurs, does not become any more of a "seizure" when police formally arrest the suspect.  In this way, arrests and seizures are somewhat like squares and rectangles:  an "arrest" is invariably a "seizure" but a "seizure" is not always an "arrest."  Whether a seizure is classified as a "stop" or an "arrest" may impact on the level of suspicion necessary to justify continued detention, but it does not affect the *fact* that a seizure has occurred.  Hodari, 499 U.S. at 624-29; see also Atwater, 532 U.S. at 347 n.16.  But cf. Clancy, supra note 11, at 174-88 (arguing for constitutional definition of "arrest").

Whren, 517 U.S. at 817-18, and the cases involving search incident to arrest are simply inapposite here.[25]

The other opinions cited by plaintiff, it is respectfully submitted, rest on a misapplication of Fourth Amendment precedent.  Several of these decisions simply import, without explanation or exploration, the rule applicable to a search incident to arrest into cases involving seizures based on individualized suspicion of a crime.  See, e.g., Ross v. Neff, 905 F.2d 1349, 1354-55 (10th Cir. 1990); Bissonette v. Haig, 800 F.2d 812, 815-16 (8th Cir. 1986) (en banc); United States v. Ryan, 128 F. Supp. 2d 232, 236 (E.D. Pa. 2000); United States v. Foster, 566 F. Supp. 1403, 1411-12 (D.D.C. 1983).  Those opinions that do reach the issue often conclude, in a somewhat ambiguous fashion, that state law is "relevant" but not necessarily dispositive of the constitutionality of the seizure.  See, e.g., United States v. Baker, 16 F.3d 854, 856 n.1 (8th Cir. 1994); see also United States v. Mikulski, 317 F.3d 1228,

---

[25] The position that state law governs the validity of an arrest for purposes of a search incident thereto is not without its detractors.  Most of the opposing commentary, however, fails to distinguish between the different rules applicable to seizures based on individualized suspicion, where state criminal law constrains police discretion, and searches incident to arrest, which are not so inherently limited.  See, e.g., Bell, 54 F.3d at 503-04; Jones, 185 F.3d at 462-63; Miller, 452 F.2d at 733-34.  Other authorities, which recognize this distinction but argue that it is without a difference, fail to offer a satisfactory constitutional definition of an "arrest."  See, e.g., McKay, 41 P.3d at 70-71; 1 LaFave, supra note 11, § 1.5(b); see also supra note 24; cf. Clancy, supra note 11, at 174-88 (addressing this issue).  The court need not fully address these issues in the context of this case, particularly in light of the Supreme Court and Third Circuit decisions applying state law in considering the validity of a search incident to arrest, but merely suggests that further judicial and scholarly inquiry is appropriate.  See, e.g., United States v. Lewis, 183 F.3d 791, 794-95 (8th Cir. 1999) (Heaney, J., concurring).

1231-33 (10th Cir. 2003); Abbott v. City of Crocker, 30 F.3d 994, 997-98 (8th Cir. 1994);

United States v. Peach, 327 F. Supp. 2d 1081, 1085-86 (D.N.D. 2004).  While this court

agrees that a single state's arrest law may be relevant as part of the jurisprudential

background in gauging the interests relating to a particular police procedure, it

plays no role in applying the constitutional rule for seizures based on

individualized suspicion of a crime.  Atwater, 532 U.S. at 347 n.16, 354.  The

opinions to the contrary are rejected.

It must be noted that one recent decision of the Court of Appeals for the

Third Circuit arguably supports the contrary position.  In Wright v. City of

Philadelphia, No. 03-1633, 2005 WL 1322852 (3d Cir. June 6, 2005), the Court of

Appeals, in addressing the constitutionality of a seizure based on individualized

suspicion, offered a brief (two-sentence) *obiter dictum* disquisition of the officers'

authority to arrest under state law.  See id. at *6.  No explanation of the relevance

of state law is provided, and the discussion is supported only by citations to United

States v. Myers, 308 F.3d 251 (3d Cir. 2002), and Ker v. California, 374 U.S. 23 (1963)

(plurality opinion).  However, both of these cases address the constitutionality of a

search incident to lawful arrest, and neither stands for the proposition that the

invalidity of an arrest under state law establishes, or even suggests, the invalidity

of a seizure under the Fourth Amendment.[26]  This court will not infer from this

---

[26] Indeed, the plurality holding in Ker lends little support to the application
of state law even in the context of a search incident to arrest, as the Supreme Court
considered state law only "insofar as it is not violative of the Federal Constitution."
Ker, 374 U.S. at 37; see also McKay, 41 P.3d at 67; 1 LaFave, supra note 11, § 1.5(a).

dictum a holding that conflicts with federal constitutional jurisprudence and prior decisions of the Supreme Court and Third Circuit. The court will, instead, follow the latter authorities, holding that the "reasonableness" of a seizure, when based on individualized suspicion, is judged without reference to the authority of officials to effect an arrest under state law.[27] Atwater, 532 U.S. at 347 n.16, 354.

Nothing in the foregoing discussion should be construed to suggest that relief is or should be unavailable to a party allegedly arrested in violation of state law. The states retain the ability to provide a civil cause of action to redress violations of arrest procedures, see, e.g., United States v. Shaffer, 520 F.2d 1369, 1372 (3d Cir. 1975), and the federal courts presumably enjoy the supervisory authority in criminal cases to exclude evidence obtained in violation of state law, see, e.g., United States v. Rickus, 737 F.2d 360, 363-64 (3d Cir. 1984).[28] However, neither of these potential remedies implicates matters of federal civil rights concern, and neither is relevant under § 1983.

The dispositive question in this case is whether the detaining officials possessed a sufficient "quantum of individualized suspicion" that Christopher had

---

[27] Accord Vargas-Badillo v. Diaz-Torres, 114 F.3d 3, 5-6 (1st Cir. 1997); Pyles v. Raisor, 60 F.3d 1211, 1215 (6th Cir. 1995); Barry v. Fowler, 902 F.2d 770, 772 (9th Cir. 1990); Street v. Surdyka, 492 F.2d 368, 371-72 (4th Cir. 1974); Madsen v. Park City, 6 F. Supp. 2d 938, 945 (N.D. Ill. 1998); cf. Whren, 517 U.S. at 817-18 (upholding seizure after noting potential violation of department regulations); Elkins, 364 U.S. at 248 (Frankfurter, J., dissenting) (noting that violation of state arrest law did not establish violation of Fourth Amendment).

[28] See also 1 LaFave, supra note 11, § 1.5; Randall T. Shepard, In a Federal Case, Is the State Constitution Something Important or Just Another Piece of Paper?, 46 Wm. & Mary L. Rev. 1437, 1446-52 (2005).

committed a violation of the Pennsylvania Motor Vehicle Code.  And this question

is open to debate.  The speed limit in the area in which Christopher was driving

was twenty-five miles per hour, and the Pennsylvania Motor Vehicle Code

criminalizes operation of a vehicle in excess of the maximum posted speed.  See 75

PA. CONS. STAT. §§ 3361-3363.  The officials assert that they observed Christopher

drive past them and were able to estimate his speed at approximately fifty miles

per hour, giving them cause to believe that Christopher had committed a criminal

violation.  Christopher disagrees, stating that he was driving near to or at the

posted speed limit.  Resolution of this factual issue, on which the propriety of the

seizure depends, involves a credibility assessment for the jury.[29]

## 2.   Fourteenth Amendment

The Equal Protection Clause of the Fourteenth Amendment to the United

States Constitution provides:  "No State shall . . . deny to any person within its

jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV, § 1.  It

guarantees fairness and equality in the treatment of individuals by government

officials.  See Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252,

264-66 (1977); Washington v. Davis, 426 U.S. 229, 239-42 (1976).  Selective

---

[29] Although an otherwise legitimate seizure may be rendered constitutionally "unreasonable" if conducted in an "extraordinary manner, unusually harmful to an individual's privacy or . . . physical interests," Whren, 517 U.S. at 818, there is no evidence that the stop in this case was uncommon or excessive.  It was relatively short and minimally intrusive, and, while Christopher complains that the officials were verbally aggressive and unnecessarily obdurate, nothing suggests that the circumstances of the stop differed from those experienced by hundreds (if not thousands) of other motorists each year.  See Atwater, 532 U.S. at 354-55.

enforcement of laws or regulations, based on race or ethnicity of an individual, may give rise to a violation to the Fourteenth Amendment.  Bradley v. United States, 299 F.3d 197, 206-07 (3d Cir. 2002) (citing Chavez v. Ill. State Police, 251 F.3d 612, 635-36 (7th Cir. 2001)).

Neither party in this case asserts, nor could they, that the evidence definitively demonstrates selective enforcement of laws *vel non*.  The record offers conflicting accounts of when officials recognized Christopher's race, whether Christopher was traveling in excess of the posted speed, and what was said during the stop.  All of these disputed facts bear on the motivations and justifications of the officials who effected the stop, and are thus material to the alleged violation of Christopher's right to equal protection of the law.  See id.  They must be left for the jury.

**B.**     **Caused by One Acting Under Color of State Law**

That an individual has suffered a civil rights violation does not guarantee recovery under § 1983.  There must also exist a causal connection between the violation and the actions of a person acting "under color of state law," such that it is fair to hold the person responsible for the harm.  See Carswell v. Borough of Homestead, 381 F.3d 235, 244 (3d Cir. 2004); Brown v. Muhlenberg Township, 269

F.3d 205, 214 (3d Cir. 2001); <u>see also</u> <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001).[30]  Only

if this link is established may liability be imposed under § 1983.  <u>Carswell</u>, 381 F.3d

at 244.

The nature of the causation analysis differs depending on whether the party

participated in the violation directly, through acts of commission, or indirectly,

through acts of omission.  Nestlerode and Kerr, who were at the scene of the stop,

fall into the former category; Hose and the County of York, who exercised

supervisory authority, fall into the latter.

## 1.    <u>Direct Causation</u>

Direct liability for a civil rights violation arises when an official actively

participated or aided in the offending conduct.  It is insufficient to show mere

acquiescence, knowledge, or *post hoc* approval.  <u>See</u> <u>Robinson v. City of Pittsburgh</u>,

120 F.3d 1286, 1293-94 (3d Cir. 1997).  Rather, the official must have had some hand

in causing the violation itself.  <u>Id.</u>; <u>see also</u> <u>Rode v. Dellarciprete</u>, 845 F.2d 1195, 1207

(3d Cir. 1988).  And, once this connection is established, it must be shown that the

---

[30] This link between causation and qualified immunity is not often drawn,
but, provided that relevant distinctions between the two concepts are maintained,
it is fully consistent with proper application of both doctrines.  <u>See</u> <u>Saucier</u>, 533
U.S. at 201; <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 806 (1982); <u>see also</u> <u>Dixon v. Burke
County</u>, 303 F.3d 1271, 1274-75 (11th Cir. 2002); <u>Camilo-Robles v. Zapata</u>, 175 F.3d 41,
43-48 (1st Cir. 1999).

official should have known, based on existing legal precedent, that the conduct was unlawful.[31]  See Saucier, 533 U.S. at 201.

Direct liability for the alleged civil rights violations in this case clearly may lie against Nestlerode.  He is the one who made the decision to detain Christopher, who spoke with Christopher, and who cited Christopher for violations of the Motor Vehicle Code.  He is alleged to have known that Christopher was, in fact, not violating any provision of Pennsylvania law and to have conducted the stop for the purpose of harassing Christopher because of the latter's race.  The record lends some support for these allegations, which, if proven, would render Nestlerode directly responsible for the violations of Christopher's rights under the Fourth and Fourteenth Amendments.

Liability against Kerr, who was training under Nestlerode, presents a closer question.  Kerr did not direct the stop, or issue the citation.  He did not speak with Christopher, or otherwise interact with him.  There would seem to be little basis for holding Kerr accountable for the alleged violations arising from the stop.  See Robinson, 120 F.3d at 1293-94.

---

[31] This is, of course, the standard for qualified immunity and is properly viewed as an affirmative defense to be asserted by the defendant, rather than an element of the plaintiff's cause of action under § 1983.  See Saucier, 533 U.S. at 201. However, distinguishing between the applicable burdens is unnecessary in this case, where defendants have properly raised the defense and a material question of fact remains extant concerning the existence of a constitutional violation.  See id.; see also supra note 30.

Yet, some evidence in the record suggests that Kerr may have played a more active role.  Kerr testified that he saw Christopher pass the sheriff's vehicle, and that he agreed with Nestlerode's assessment that Christopher should be pulled over for violating posted speed limits.  Kerr then assisted Nestlerode by reporting the incident to headquarters as a valid traffic stop and by securing the rear of Christopher's vehicle while Nestlerode spoke.  These actions, although arguably in conformance with standard procedures, may be viewed as active assistance in the violations of Christopher's constitutional rights.  See id.  Whether Kerr's conduct rose to the level of direct participation is a factual issue that can be resolved only by the jury, after weighing the opposing evidence.

Whatever the jury's findings on the existence *vel non* of a constitutional deprivation, it is clear that Nestlerode and Kerr should have known that their conduct (if plaintiff's version of events is established) violated clearly established rights under the Fourth and Fourteenth Amendments.  A series of Supreme Court cases stretching over the last thirty years have admonished state officers that a stop of a vehicle must be based at least on reasonable suspicion and must not be premised on discriminatory animus.  See, e.g., Prouse, 440 U.S. at 654-55; Davis, 426 U.S. at 239-42.  The record in this case, considered in the light most favorable to plaintiff, establishes that Nestlerode and Kerr decided to detain Christopher without suspicion of a crime and for the purpose of harassing him because of his race.  This would represent a clear violation of Christopher's Fourth and Fourteenth Amendments, and liability may lie against these defendants.  See

<u>Saucier</u>, 533 U.S. at 201.  The motion for summary judgment on these claims will be denied.

### 2.   <u>Indirect Causation</u>

Supervisory officials who did not directly participate in a constitutional violation may nonetheless be held responsible for it under § 1983 if they knowingly ratified or allowed the unlawful conduct.  <u>See, e.g.</u>, <u>Andrews v. City of Philadelphia</u>, 895 F.2d 1469, 1478 (3d Cir. 1990); <u>see also</u> <u>Robinson</u>, 120 F.3d at 1294. This is not a form of <i>respondeat superior</i>, and is not imposed merely because a supervisor was negligent in training or hiring practices.  <u>Id.</u>; <u>see also</u> <u>Bd. of County Comm'rs v. Brown</u>, 520 U.S. 397, 404-07 (1997).  Rather, it requires proof that the supervisory official had reason to know that the violation was likely to occur and yet failed to institute policies to prevent such abuses to the extent possible. <u>Robinson</u>, 120 F.3d at 1294.  A supervisor who is aware of but disregards (i.e., is "deliberately indifferent" to) a potential risk to an individual's civil rights is liable to the individual if and when that risk materializes.  <u>Id.</u>; <u>see also</u> <u>City of Canton v. Harris</u>, 489 U.S. 378, 388 (1989); <u>Monell v. Dep't of Social Servs.</u>, 436 U.S. 658, 694 (1978).

In assessing whether indirect liability may be imposed on a supervisor or municipality for failure to train, it is important to focus on the precise nature of the underlying violation committed by the subordinate.  <u>E.g.</u>, <u>Brown</u>, 520 U.S. at 410.  A close correlation must exist between the circumstances of the violation and the nature of the risk of which the supervisor should have been aware.  <u>Id.</u>  If the

potential risk and the actual violation are not factually aligned, it would be unfair to impute knowledge of the risk to the supervisor.  Id. at 410-12.  In other words, only when the supervisor had reason to know that the subordinate "was highly likely to inflict the *particular* injury suffered by the plaintiff" may the supervisor be held liable under § 1983.  Id. at 412; see also Reitz v. County of Bucks, 125 F.3d 139, 144-45 (3d Cir. 1997).

There is simply insufficient evidence of this correlation to support the claims against Hose and the County of York.  It is undisputed that both Nestlerode and Kerr received training on the constitutional prerequisites for a seizure based on individualized suspicion and on the constitutional guarantee that all persons be treated fairly without regard to race or ethnicity.  This was supplemented by statements, issued by the sheriff's department, affirming the department's commitment to ensuring equal justice for all.  (See Doc. 29 ¶¶ 84-104; Doc. 29, Exs. G, H; Doc. 52 at 21-37; Doc. 53 ¶¶ 84-104; Doc. 63, Ex. A).  These policies informed and constrained officers' discretion in effecting stops and issuing citations.  Neither Hose nor the County of York can be said to have known "to a moral certainty," based on an absence of policy directive, that subordinates would likely engage in conduct violating citizens' civil rights.  See Canton, 489 U.S. at 390 n.10; see also Carswell, 381 F.3d at 245; Berg v. County of Allegheny, 219 F.3d 261, 276-77 (3d Cir. 2000).

Plaintiff complains that, despite the training and departmental statements on the constitutional obligation of equal enforcement of the laws, the policy in the

sheriff's department was clearly deficient because it did not include the phrase "racial profiling."  But, of course, neither does the Constitution.  <u>See, e.g.</u> U.S. CONST. amend. XIV, § 1.  The policy instructed sheriffs and deputies that all stops must be made on grounds of individualized suspicion and that all citizens must be treated equally.  It specifically admonished against unfair or selective enforcement of the laws.  While not using the phrase "racial profiling," the policy plainly targeted such conduct.[32]  See <u>Bradley</u>, 299 F.3d at 206-07; <u>Chavez</u>, 251 F.3d at 635-36.

Nor would Hose or the County of York have had reason to know of a risk of biased policing based on Nestlerode's or Kerr's past performance, or the history of the sheriff's department in general.  Neither officer had been cited previously for racial profiling or another clearly race-based offense.  While Nestlerode had been disciplined by Hose "for leaving two black and two Hispanic inmates locked in a transport van for several hours on an August day," this incident was unrelated to traffic enforcement and, more importantly, there is no evidence that the offense was linked to racial animus.  (<u>See, e.g.</u>, Doc. 52 at 130-34; Doc. 58 at 15).  Nothing in these officers' personnel records would put a supervisor on notice that Nestlerode or Kerr were likely to effect stops without probable cause or to engage in racial profiling.  See <u>Brown</u>, 520 U.S. at 410-14; <u>Beck v. City of Pittsburgh</u>, 89 F.3d 966, 973-74 (3d Cir. 1996).

---

[32] Notably, plaintiff admits that Hose believed that "[n]o reason existed for requiring specific training or supervision . . . regarding 'racial profiling' when all of the policies, practices, procedures and training required that deputies treat all individuals fairly and equally regardless of race, sex or ethnicity."  (Doc. 53 at 30).

It may be true, as noted in plaintiff's briefs, that Nestlerode has a less than exemplary law enforcement record.  He was admonished by his previous employer, a municipal police department, for misusing resources for his own benefit and for misconduct during citizen encounters.  He lost property of a Hispanic individual who was taken into custody.[33]  He admitted during testimony that, if stopped by another officer, he would "flash his badge" to avoid a citation, in violation of standard policy.  Nevertheless, Hose was not informed of these incidents.  (See, e.g., Doc. 52 at 130-34).  Even if he had been, this misconduct is indicative of a propensity to violate standard procedures, not to violate the Fourth and Fourteenth Amendment rights of citizens.  However unfavorably these infractions reflect on Nestlerode's professionalism, none of them would have alerted Hose to the potential for biased policing.[34]  See Brown, 520 U.S. at 410-14; see also Johnson v. Elk Lake Sch. Dist., 283 F.3d 138, 144 n. 1 (3d Cir. 2002).

There was similarly no basis in the general history of the department by which Hose and the County of York should have surmised that a problem existed.  Race relations have been a matter of public discussion in York for some time, and Hose was aware of accusations that white law enforcement officials treated

---

[33] Again, although this incident involved a member of a minority group, there is no evidence that it was linked to racial animus.  (See Doc. 52 at 133-36).

[34] See Brown, 520 U.S. at 411 ("Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute 'deliberate indifference.'").

African-American individuals unequally.  However, none of the charges apparently implicated members of the sheriff's department.  (Doc. 69, Ex. D ¶ 9; <u>see also</u> Doc. 52 at 186-94).  Hose had no reason to assume that officials in the department were prone to engage in such conduct, particularly in light of the training requirements relating to cultural diversity and his admonitions concerning the need for equal treatment under the law.  <u>See</u> <u>Canton</u>, 489 U.S. at 390-91; <u>see also</u> <u>Brown</u>, 520 U.S. at 410-14; <u>Beers-Capitol v. Whetzel</u>, 256 F.3d 120, 137-40 (3d Cir. 2001).

The record in this case reflects, in the light most favorable to plaintiff, an isolated incident of racial prejudice.  The record does *not* reflect a history of similar violations in the sheriff's department, the presence of racial animus among deputies, or reports of race-based offenses in the personnel records of Nestlerode and Kerr.  Deputy sheriffs were trained on issues of cultural diversity, and were taught to enforce laws equally regardless of ethnicity or race.  Neither Hose nor the County of York had any reason to suspect that an incident of this type would arise or that additional training was necessary.[35]  Thus, they cannot be held liable for the alleged violations against Christopher.  <u>See</u> <u>Brown</u>, 520 U.S. at 415; <u>A.M. ex rel.</u>

---

[35] An expert report submitted by plaintiff (Doc. 53, Ex. J) opines that Hose was "deliberately indifferent" to the potential for racial profiling but does not offer, beyond generalizations about the recent prevalence of the issue in the national dialogue, any proof that Hose should have been aware that Nestlerode or Kerr would engage in the practice.  <u>See</u> <u>Brown</u>, 520 U.S. at 410-15 ("Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat superior* liability.").

J.M.K. v. Luzerne County Juvenile Det. Ctr., 372 F.3d 572, 580-85 (3d Cir. 2004).

Summary judgment on these claims will be granted.[36]

IV.   **Conclusion**

      The Constitution embodies and protects the rights of all citizens to freedom from unreasonable seizures and to equal protection of law.  These rights do not flow from, and cannot be dependent upon, on the policies of a single state.  They are inalienable, indelible, and national.  Their interpretation is solely a matter of federal law.

      Whether these federal rights have been violated in this case hinges on resolution of several disputed factual questions.  These matters will be left for trial, to allow a jury to decide whether the traffic stop at issue was a responsible exercise of police authority or an example of unconstitutional racial profiling.

    S/ Christopher C. Conner
    CHRISTOPHER C. CONNER
    United States District Judge

Dated:      June 22, 2005

---

[36] Based on this conclusion, the court need not address the rather reticulate question of whether Hose, in his law enforcement and training capacities, was a policymaker for the County of York or the Commonwealth of Pennsylvania.  See McMillian v. Monroe County, 520 U.S. 781, 784-95 (1997); Williams v. Fedor, 69 F. Supp. 2d 649, 658-60 (M.D. Pa. 1999); Open Inns, Ltd. v. Chester County Sheriff's Dep't, 24 F. Supp. 2d 410, 422 (E.D. Pa. 1998).

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RAPHAEL CHRISTOPHER,** | : | **CIVIL ACTION NO. 1:04-CV-0977** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **FREDERICK NESTLERODE, et al.,** | : | |
| | : | |
| **Defendants** | : | |

## <u>ORDER</u>

AND NOW, this 22nd day of June, 2005, upon consideration of the cross-motions for summary judgment (Docs. 26, 32, 67, 69, 72), and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that the cross-motions (Docs. 26, 32, 67, 69, 72) are GRANTED in part and DENIED in part as follows:

1.  Summary judgment is GRANTED in favor of defendants Williams Hose and the County of York.

2.  Summary judgment is otherwise DENIED.

3.  The Clerk of Court is directed to defer the entry of judgment until the conclusion of this case.

   S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge